IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | |
|---|---|
| LONNIE KADE WELSH, <br> Institutional ID No. 6516607, <br><br> Plaintiff, <br><br> v. <br><br> JAMES THOMAS CAMMACK, <br><br> Defendant. | § <br> § <br> § <br> § <br> § <br> § CIVIL ACTION NO. 5:22-CV-098-BQ <br> § <br> § <br> § <br> § <br> § |

## REPORT AND RECOMMENDATION

Proceeding pro se and *in forma pauperis*, Plaintiff Lonnie Kade Welsh filed this 42 U.S.C. § 1983 action alleging violations of his constitutional rights. *See* ECF Nos. 1, 16. The United States District Judge transferred the case to the undersigned United States Magistrate Judge for further proceedings. ECF No. 5. Not all parties have consented to proceed before the undersigned magistrate judge. In accordance with the order of transfer, the undersigned enters this Report and recommends that this action be dismissed under 28 U.S.C. § 1915(e)(2)(B).

## I.  Background

Welsh was tried and civilly adjudged to be a sexually violent predator (SVP), as defined by Texas Health & Safety Code § 841.003. Upon his release from the Texas Department of Criminal Justice (TDCJ) after completing his criminal sentence, the State of Texas transferred Welsh to the Bill Clayton Detention Center in Littlefield, Texas,[1] for inpatient treatment in accordance with the provisions of Texas Health & Safety Code § 841.081.[2]

---

[1] The Bill Clayton Detention Center is also known as the Texas Civil Commitment Center (TCCC), which is apparently currently operated by Management & Training Corporation (MTC), a private company under contract with the Texas Civil Commitment Office (TCCO).

[2] A recent notice of change of address filed by Welsh indicates that he is currently detained at the Lamb County Jail. *See Welsh v. Correct Care Recovery Sols.*, No. 5:18-cv-020-BQ, ECF No. 231 (N.D. Tex. June 2, 2023).

At the time of filing, Welsh was confined at the TCCC pursuant to an order of civil commitment; therefore, he is not considered a "prisoner" within the meaning of 28 U.S.C. § 1915(h) and is not subject to the screening procedures of 28 U.S.C. § 1915A. *See Bohannan v. Doe*, 527 F. App'x 283, 289–90 (5th Cir. 2013) (per curiam) (concluding that a civilly committed SVP was not a prisoner within the meaning of the Prison Litigation Reform Act); *Michau v. Charleston Cnty.*, 434 F.3d 725, 727 (4th Cir. 2006) (same); *Allen v. Seiler*, No. 4:12–CV–414–Y, 2013 WL 357614, at *1 n.1 (N.D. Tex.) (same), *aff'd*, 535 F. App'x 423, 423 (5th Cir. 2013) (per curiam). Because Welsh is proceeding IFP, however, he is nevertheless subject to the screening provisions of 28 U.S.C. § 1915(e)(2)(B). *See* ECF No. 11.

## II. Standard of Review

Section 1915(e) requires dismissal of an IFP complaint *at any time* if the court determines the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)–(iii); *see Newsome v. E.E.O.C.*, 301 F.3d 227, 231–33 (5th Cir. 2002) (per curiam) (affirming dismissal of pro se, non-prisoner plaintiff's claims as frivolous and for failure to state a claim under § 1915(e)(2)(B)(i) and (ii)). A frivolous complaint lacks any arguable basis, either in fact or in law, for the wrong alleged. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A complaint has no arguable basis in fact if it rests upon clearly baseless factual contentions, and similarly lacks an arguable basis in law if it embraces indisputably meritless legal theories. *See id.* at 327. When analyzing a pro se plaintiff's complaint, the court may consider reliable evidence such as the plaintiff's allegations, responses to a questionnaire, and authenticated records. *See Wilson v. Barrientos*, 926 F.2d 480, 483–84 (5th Cir. 1991); *see also Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999) (noting responses given to a questionnaire are incorporated into the plaintiff's pleadings); *Banuelos v. McFarland*, 41 F.3d 232, 234 (5th Cir. 1995) (per curiam)

(holding that courts may dismiss prisoners' in forma pauperis claims as frivolous based on "medical and other prison records if they are adequately identified or authenticated" (internal quotation marks omitted)).

In evaluating the sufficiency of a complaint, courts accept well-pleaded factual allegations as true, but do not credit conclusory allegations or assertions that merely restate the legal elements of a claim. *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir. 2016) (per curiam). And while courts hold pro se plaintiffs to a more lenient standard than lawyers when analyzing complaints, such plaintiffs must nevertheless plead factual allegations that raise the right to relief above a speculative level. *Id.* (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002)).

### III.   Discussion

#### A. Welsh's Allegations

Welsh asserts claims against a single Defendant, James Thomas Cammack, M.D.,[3] in his individual capacity. Comp. 1–2, ECF No. 1.[4] Dr. Cammack is a urologist at University Medical Center (UMC) in Lubbock, Texas. *Id.* at 2–3. Welsh explains that on July 1, 2020, he had a medical appointment with Dr. Cammack. *Id.* at 3. Welsh reported to Dr. Cammack that he was experiencing frequent urination at night, which was preventing him from sleeping "more than two hours at a time." *Id.*; *see id.* at 12 (Dr. Cammack documented that Welsh recounted suffering "severely bothersome" symptoms at night.); Questionnaire 4, ECF No. 16 (alleging that since 2012, he has "had problems urinating all night long," waking anywhere from six to fifteen times per night to use the restroom). Welsh had apparently "been taking a medication [called]

---

[3] Welsh refers to the doctor as both "James" and "John" and spells the surname "Cammack" and "Cammock." *E.g.*, Compl. 1, 2. The Court adopts the name reflected by the medical record attached to Welsh's Complaint. *Id.* at 12.

[4] Page citations to Welsh's Complaint refer to the electronic page number assigned by the Court's electronic filing system.

3

[O]xybutynin for several months prior to the July 1, 2020 doctor visit" to address this condition. Compl. 4.

According to Welsh, Dr. Cammack "offered to increase the dosage" of Oxybutynin "to see if the increase . . . would help with" Welsh's condition. *Id.*; *see also id.* at 13 (Dr. Cammack reported he "offered to increase [Welsh's] medication and initially this seemed to be acceptable for [Welsh].").[5] Welsh avers that he assented to the increase, though he pleads no specific facts as to how he conveyed his acceptance to Dr. Cammack. *See* Questionnaire 1 (contending that he verbally agreed to the higher dosage but failing to provide any details concerning what he told Dr. Cammack). Welsh explains, however, that he also asked Dr. Cammack to prescribe a "sleep aid" because Welsh "was in desperate need of sleep." Compl. 4–5; Questionnaire 2; *see also* Compl. 13 (Dr. Cammack similarly noted that Welsh asked for a "sleep aid or sleep medication."). Welsh asserts that at first, Dr. Cammack responded that unidentified individuals would not permit him to prescribe a sleep aid. Compl. 4; Questionnaire 2. Dr. Cammack then allegedly told Welsh that "he does not like to give sleep aids" and "that Welsh will just have to train himself not to use the bathroom at night." Compl. 4 (internal quotation marks omitted); Questionnaire 2; *see also* Compl. 13 (Dr. Cammack documented that he told Welsh he "could not" prescribe a sleep aid and that Welsh "would have to check with his institutional MD."). Ultimately, Dr. Cammack "told Welsh that the increase[d] dose of [O]xybutynin [was] the best he [could] do for Welsh." Compl. 4; *see* Questionnaire 2 (claiming that Dr. Cammack said he could not help with a sleep aid).

Welsh contends Dr. Cammack moved to exit the room, at which point Welsh called Dr. Cammack a "piece of shi\*." Compl. 5; Questionnaire 2. Dr. Cammack purportedly "shut the door," and Welsh "told his security escort that he was going to su[e]" Dr. Cammack. Compl. 5.

---

[5] Welsh also references a medical record he has attached to the Complaint. *See, e.g.*, Compl. 6.

4

Welsh alleges that "[t]he medical records show that" Dr. Cammack initially ordered an "increase in his [O]xybutynin," "but then declined to do so because Welsh threaten[ed] him with legal action." *Id.* at 6. Welsh does not point to a specific record from Dr. Cammack supporting this assertion, however, and he indicates that MTC—rather than Dr. Cammack—made the notation. Questionnaire 2 ("MTC electronic records stated this . . . .").

The authenticated records reflect that after the July 1 incident, Dr. Cammack elected to terminate Welsh as a patient. *See also* Compl. 13 (Dr. Cammack reported that he had "no desire to continue car[ing] for" Welsh due to Welsh's "belligerent," "aggressive," and "verbally abusive" behavior.). Dr. Cammack sent a letter dated July 8, 2020, to Welsh via the TCCC, advising Welsh of his decision. Although it is unclear whether or when Welsh received the letter, Welsh nevertheless learned of Dr. Cammack's decision. *See* Compl. 5 (stating that a few days after July 1, Welsh inquired into the status of the medication and TCCC medical staff "informed Welsh that [Dr.] Camm[a]ck did not order the increase dose of [O]xybutynin and that he . . . also refused to treat any of Welsh's future needs"); Questionnaire 3–4 (indicating that at an unknown date, he "placed a request with [MTC] . . . to receive [his] medical records," at which point he received notice of Dr. Cammack's decision). The letter informed Welsh that Dr. Cammack would "no longer be [Welsh's] physician and [would] stop providing medical care to [him] 30 days from the date [he] receive[d] th[e] letter." Dr. Cammack stated that he would "continue to provide routine and emergency care to [Welsh] for 30 days while [Welsh] [sought] another physician."

Despite termination of the physician-patient relationship, Welsh continued receiving his original dosage of Oxybutynin at the TCCC "until the prescription ran out." Questionnaire 5. He avers that he is not currently taking Oxybutynin, there is "[n]o other urologist . . . available to [see him] because [he] [is] civilly committed and the State will not allow it," and he continues to experience frequent urination at night. *Id.* at 4–6; *see* Compl. 6–7.

5

Based on the foregoing allegations, Welsh asserts three claims: (1) Dr. Cammack was deliberately indifferent to his serious medical need "by refusing to increase the dose of [O]xybutynin" (Compl. 7; *see* Questionnaire 3); (2) Dr. Cammack violated his Fourteenth Amendment rights "by deliberately refusing [Welsh] the need to help him sleep uninterrupted throughout the evening hours due to his problem of frequently urinating at night" (Compl. 7–8); and (3) Dr. Cammack retaliated by terminating Welsh as a patient and refusing to prescribe the increased dosage of Oxybutynin after Welsh threatened to sue Cammack (*id.* at 8; Questionnaire 3). Welsh seeks monetary damages for the alleged constitutional violations. Compl. 8–9.

### B. Welsh has failed to plead sufficient facts demonstrating Dr. Cammack was deliberately indifferent to Welsh's serious medical need.

The Constitution requires that institution officials provide adequate medical care.[6] *Rogers v. Boatright*, 709 F.3d 403, 409 (5th Cir. 2013). A plaintiff seeking to establish a constitutional violation in regard to medical care must allege facts showing that officials were deliberately indifferent to his serious medical needs. *Morris v. Livingston*, 739 F.3d 740, 747 (5th Cir. 2014) (explaining that because "only the 'unnecessary *and wanton* infliction of pain' implicates the

---

[6] Welsh refers to the Fourteenth Amendment in connection with his "deliberate indifference to . . . serious medical needs" claim. Compl. 7. An SVP's medical care claim *is* evaluated under the deliberate indifference standard, regardless of the applicable amendment. *See Rogers v. Caswell*, 823 F. App'x 263, 264–65 (5th Cir. 2020) (per curiam) (analyzing whether civilly committed plaintiff pleaded facts supporting claim for deliberate indifference to serious medical needs); *Bohannan*, 527 F. App'x at 292 (applying Eighth Amendment standard to SVP's claim for deliberate indifference to serious medical needs); *see also Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996) (applying deliberate indifference standard to pretrial detainee's medical care claim). For this reason, the Court finds that cases applying the deliberate indifference standard under both the Eighth and Fourteenth Amendments are relevant to this analysis.

Welsh also attempts to raise a standalone Fourteenth Amendment claim based on Dr. Cammack's alleged "deliberate[] refus[al] . . . to help [Welsh] sleep uninterrupted throughout the evening hours." Compl. 7–8. Welsh does not specify whether he intends to assert a claim under the Fourteenth Amendment's Due Process Clause or whether he is making a claim of deliberate indifference. *Id.* Welsh's purported inability to sleep at night stems from his medical condition. *Id.* at 5–8. Stated differently, Welsh's intermittent sleep is a result of, or is secondary to, his medical condition. Moreover, Welsh denies asserting a claim based on Dr. Cammack's purported denial of a sleep aid. Questionnaire 3. Thus, the Court considers Welsh's allegation in conjunction with his deliberate indifference claim rather than a standalone claim under the Due Process Clause—i.e., the Court evaluates the substance, rather than label, of Welsh's claim. *See Welsh v. Correct Care Recovery Sols.*, 845 F. App'x 311, 320–21 (5th Cir. 2021) (unpublished) (citing *Hernandez v. Thaler*, 630 F.3d 420, 426–27 (5th Cir. 2011)).

6

Eighth Amendment, a prisoner advancing such a claim must, at a minimum, allege 'deliberate indifference' to his 'serious' medical needs" (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991))). "Deliberate indifference is an extremely high standard to meet" (*Brewster v. Dretke*, 587 F.3d 764, 770 (5th Cir. 2009) (per curiam) (internal quotation marks and citation omitted)) and requires satisfaction of both an objective and a subjective component. *Rogers*, 709 F.3d at 410. A plaintiff must first prove objective exposure to a substantial risk of serious bodily harm. *Gobert v. Caldwell*, 463 F.3d 339, 345 (5th Cir. 2006). As to the subjective component, an official acts with deliberate indifference only where he (1) "knows [the] [plaintiff] face[s] a substantial risk of serious harm" and (2) "disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *Gobert*, 463 F.3d at 346; *see also Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999) (per curiam) (stating that prison official is not liable for denial of medical treatment unless he knows of and disregards an excessive risk to inmate health or safety).

An official's "failure to alleviate a significant risk that the official should have perceived, but did not, is insufficient to show deliberate indifference." *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001) (alterations and internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 838). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001). Instead, an official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Brewster*, 587 F.3d at 770 (quoting *Farmer*, 511 U.S. at 837); *see Lawson v. Dallas Cnty.*, 286 F.3d 257, 262 (5th Cir. 2002) (holding that deliberate indifference is a "subjective inquiry," and inmate must show prison official was actually aware of risk of harm and consciously ignored it).

Allegations of malpractice, negligence, or unsuccessful treatment fail to establish deliberate indifference. *Gobert*, 463 F.3d at 346. Similarly, a plaintiff's disagreement with the medical treatment provided does not give rise to a constitutional claim (*Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997)), and a delay in delivering medical care creates constitutional liability only where the alleged deliberate indifference results in substantial harm. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993). In sum, a plaintiff must demonstrate that staff "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" to state a viable Eighth Amendment claim for deliberate indifference to serious medical needs. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985).

Welsh alleges that Dr. Cammack acted with deliberate indifference by recommending, but then failing to prescribe, the *increased* dosage of Oxybutynin. Questionnaire 3; *see id.* at 2; Compl. 4–7. Welsh asserts that "he understood [Dr. Cammack] to have prescribed the increase[d] medicine for him consistently urinating at night" to help alleviate going "to the bathroom every two hours." Compl. 6; *see id.* at 4 (alleging that Dr. Cammack "offered to increase the dosage . . . to see if the increase in medication would help with the problem"). Because he did not receive the higher dosage, Welsh avers he continued to suffer from frequent urination at night and was "deprived the life necessity of sleep." *Id.* at 6–7; Questionnaire 5–6. Welsh explains, however, "that it has been years since he had sleep that was not consistently interrupted by" using the restroom. Compl. 5; *see* Questionnaire 4 ("Since 2012, I have had problems urinating all night long. On a good night I wake about 6 times . . . .").

Welsh has not pleaded facts demonstrating Dr. Cammack was deliberately indifferent. Welsh concedes that Dr. Cammack offered to increase the medication dosage "to see if the increase . . . would help with the problem." Compl. 4; *see id.* at 5–7; Questionnaire 2–4. Dr. Cammack

8

also recommended that Welsh "train" his body "not to use the bathroom at night." Compl. 4. That is, Dr. Cammack was responsive to Welsh's complaint and provided a suggested course of treatment, which does not evidence deliberate indifference. *See, e.g., Taylor v. CMCF 720 Clinic*, 254 F. App'x 423, 424 (5th Cir. 2007) (per curiam) (affirming dismissal of prisoner's medical care claim where he failed to plead facts showing "that the defendants *disregarded* an excessive risk to his health"); *Domino*, 239 F.3d at 756 ("[T]he plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" (citation omitted)). Welsh's disagreement with at least a portion of that treatment—bladder training—is insufficient to implicate the Constitution. *See, e.g., Norton*, 122 F.3d at 292; *see also Rager v. Prison Health Servs., Inc.*, No. 3:10–CV–0594, 2012 WL 1057381, at *3 (M.D. Pa. Mar. 28, 2012) ("'Bladder training' refers to measures taken to train the bladder muscles to increase bladder control.").

That Dr. Cammack subsequently elected to terminate care after Welsh verbally berated Cammack does not alter this conclusion. *See* Compl. 4–7; Questionnaire 2–4. Dr. Cammack apparently provided the TCCC and Welsh thirty days to obtain a new urologist. Welsh is not constitutionally entitled to see the physician of his choice, nor is a physician required to continue treating a patient under the circumstances described by Welsh. *See Parker v. Smith*, No. 93-5542, 1994 WL 198944, at *2 (5th Cir. May 6, 1994) (finding no error in district court's dismissal of prisoner's claim that officials failed to take him to a doctor of his choosing for a second opinion); *Buckley v. Stanley*, No. 5:09cv175, 2010 WL 2813575, at *11 (E.D. Tex. July 1, 2010) ("Dr. Stanley was not obligated to accept abuse from the [p]laintiff or any other patient."), *R. & R. adopted by* 2010 WL 2813570 (E.D. Tex. July 15, 2010); *Grayson v. Kemp*, No. 4:06CV116-TSL-

LRA, 2008 WL 534544, at *2 (S.D. Miss. Feb. 5, 2008) (concluding plaintiff's allegation that he was not "allowed to see the physician of his choice" did "not state a constitutional violation").

Welsh asserts that Dr. Cammack was aware of a substantial risk of serious harm based on Welsh's report that he was frequently urinating at night and unable "to sleep more than two hours at a time." Compl. 3, 5–7; *see id.* at 5 (asserting that he told Dr. Cammack the interrupted sleep "was producing . . . sever[e] mental problems such as short temper, mood swings, sever[e] depression, suicidal thoughts, hallucinations, and memory problems"). Welsh, however, has apparently lived with this issue "[s]ince 2012." Questionnaire 4. He pleads no facts demonstrating that he required emergent care on July 1 or that Dr. Cammack inferred a substantial risk of serious harm if Welsh did not immediately receive the higher dosage, particularly given that Welsh had lived with the condition for years. *See id.*; Compl. 4–5 (stating that he told Dr. Cammack "it ha[d] been years since he had [slept]" and that Dr. Cammack *offered* to increase the Oxybutynin dosage "to *see* if the increase in medication would help with" Welsh's condition (emphasis added)); *e.g.*, *Williams v. Scheef*, 824 F. App'x 268, 270 (5th Cir. 2020) (per curiam) (explaining that "[d]eliberate indifference requires" that the official "knew [the prisoner] was at risk of *serious* or *substantial* or *excessive* harm," rather than merely being "aware of *some* risk of harm"); *Green v. Shaw*, 827 F. App'x 95, 98 (2d Cir. 2020) ("Under the circumstances presented here, [defendant's] failure to provide treatment for an apparently non-emergency condition on a single occasion does not indicate deliberate indifference.").[7]

---

[7] The Court observes that Dr. Cammack's medical note indicates that although the proposed increased dosage "*initially* . . . seemed . . . acceptable" to Welsh, Welsh then asked for a "sleep aid" and became "verbally abusive" when Dr. Cammack declined to prescribe one. Compl. 13 (emphasis added). Thus, it appears Welsh and Dr. Cammack never reached an agreement or understanding as to his future treatment (including whether Welsh wished to try the higher dosage), given the termination of their discussion due to Welsh's abusive behavior. *See id.* The Court nevertheless accepts as true Welsh's assertion that he verbally agreed to try the increased dosage. Questionnaire 1.

10

Nor has Welsh pleaded facts demonstrating Dr. Cammack was aware that, in terminating him as a patient and no longer overseeing his care, Welsh would have no other medical options, such as undergoing further evaluation or receiving the higher dosage from another physician, either in the free world or at the TCCC. *See* Compl. 4–7; Questionnaire 2–4. Similarly, Welsh does not contend that he did not receive additional medical care at the TCCC.[8] *See* Compl. 4–7; Questionnaire 2–4. Ultimately, Welsh's pleadings indicate that Welsh did not receive the higher dosage because Dr. Cammack terminated the physician-patient relationship (as a result of Welsh's behavior)—not because Dr. Cammack deliberately ignored Welsh's complaints.

Moreover, even after Dr. Cammack terminated Welsh as a patient, Welsh continued taking his current dosage of Oxybutynin "until the prescription ran out." Questionnaire 5. The authenticated records show, and Welsh agrees, that he maintained his original dosage between July 2 and July 28, as well as between July 30 and August 31, 2020—i.e., more than thirty days after Dr. Cammack terminated Welsh as a patient. *Id.* The fact that *TCCC officials* either (1) did not provide and/or prescribe the higher dosage, or (2) could not locate another urologist to treat Welsh, does not impute liability to Dr. Cammack—a physician who worked for UMC, not the TCCC. *See* Compl. 3, 6; Questionnaire 4 (claiming that "[n]o other urologist is available to [him] because [he] [is] civilly committed and the State will not allow it").

In sum, Welsh's continuing symptoms may have been "unpleasant." *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). Their "existence does not, however, in and of itself demonstrate" that Dr. Cammack acted with deliberate indifference. *Id.* The undersigned therefore recommends the district judge dismiss Welsh's claims based on Dr. Cammack's alleged failure to prescribe the higher dosage of Oxybutynin and his purported inability to achieve uninterrupted sleep as a result.

---

[8] To the contrary, the authenticated records indicate that Welsh had access to medical care and in fact utilized that care.

### C. Welsh has not pleaded sufficient facts showing Dr. Cammack unconstitutionally retaliated against him.

Welsh contends that Dr. Cammack retaliated by (1) initially increasing his medication dosage but then rescinding that prescription, and (2) terminating him as a patient. Compl. 5–6, 8; Questionnaire 3. In Welsh's view, Dr. Cammack retaliated because Welsh threatened to sue him "for inadequate medical care and civil rights violations by refusing to provide the increase[d] medication." Compl. 8.

To successfully assert a retaliation claim, civilly committed persons must show: "(1) a specific constitutional right; (2) the defendant's intent to retaliate based on the exercise of that right; (3) a retaliatory adverse act; and (4) causation." *Bohannan*, 527 F. App'x at 299 (citing *Jones v. Greninger*, 188 F.3d 322, 324–25 (5th Cir. 1999) (per curiam)). A plaintiff "must allege more than his personal belief that he is the victim of retaliation," and conclusory "allegations of retaliation will not be enough" to support such a claim. *Jones*, 188 F.3d at 325. To establish causation, a plaintiff must demonstrate that "but for the retaliatory motive[,] the complained of incident . . . would not have occurred." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). A plaintiff "must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred." *Id.* (internal quotation marks omitted).

Initially, the Court observes that Welsh has not pleaded facts showing he exercised a constitutional right. Although complaining about a state actor's conduct "through proper channels," such as a grievance or § 1983 lawsuit, "is a constitutionally protected activity," the *threat* of initiating First Amendment action is not afforded the same protection. *Hanna v. Maxwell*, 415 F. App'x 533, 535–36 (5th Cir. 2011) (per curiam) (affirming district court's dismissal of prisoner's claim, where prisoner "alleged retaliation after threatening to file a lawsuit during a

12

confrontation with corrections officers"); *see, e.g., Cardona v. Tuite*, 258 F. App'x 643, 644 (5th Cir. 2007) (per curiam) (observing that where prisoner did not avail himself of "the internal grievance procedure to protest" defendant's directive but instead orally protested, prisoner failed to show "that any 'retaliation' was in response to his exercise of a First Amendment right"); *Patrick v. Hirbst*, No. 2:19-CV-65, 2019 WL 3416617, at *5 (S.D. Tex. May 20, 2019) ("Making such a threat to file a grievance does not amount to the exercise of a specific constitutional right."). Thus, Welsh's threat "to file litigation against [Dr. Cammack] for inadequate medical care and civil rights violations" (Compl. 8) cannot form the basis of a viable retaliation claim. *See, e.g., Peters v. Quarterman*, 252 F. App'x 705, 706 (5th Cir. 2007) (per curiam) (explaining plaintiff failed to state a retaliation claim based on "his threat to expose a corrections officer's alleged misconduct," as such threat did not "amount[] to his exercise of a specific constitutional right"); *Patrick*, 2019 WL 3416617, at *5 (dismissing prisoner's retaliation claim, where at the time of the purportedly retaliatory conduct, prisoner "had only threatened to" file a grievance against defendant); *Spann v. Strain*, No. 16-4126, 2016 WL 7626574, at *8 (E.D. La. Dec. 9, 2016) ("[Plaintiff's] retaliation claim based on his threat to file a lawsuit does not assert a violation of a specific constitutional right and should be dismissed."), *R. & R. adopted by* 2017 WL 24812 (E.D. La. Jan. 3, 2017), *aff'd*, 726 F. App'x 265 (5th Cir. 2018) (per curiam); *Vinzant v. Smith*, No. 1:14–CV–00147, 2015 WL 9673883, at *9 (W.D. La. Sept. 17, 2015) (recommending district court grant summary judgment on plaintiff's retaliation claim, where plaintiff's "threat to sue [defendant] was not the actual exercise of his constitutional right of access to the courts"), *R. & R. adopted by* 2016 WL 99117 (W.D. La. Jan. 7, 2016).

Similarly, Welsh has not pleaded facts establishing retaliatory motive and causation. The only constitutional right Welsh exercised that could provide the basis for an actionable retaliation claim, i.e., filing this action, occurred almost two years *after* Dr. Cammack allegedly retaliated by

13

rescinding the higher-dose prescription and terminating Welsh as a patient. *See* Compl. 3, 5–6, 8, 14. This negates causation as a matter of law. *See, e.g., Mendoza v. Strickland*, 414 F. App'x 616, 619–20 (5th Cir. 2011) (per curiam) (holding detainee failed to state a retaliation claim where alleged retaliatory conduct occurred *before* detainee filed a grievance and therefore detainee "failed to allege a chronology of events from which we can plausibly infer retaliation"); *Peters*, 252 F. App'x at 706 ("Retaliation may be inferred from the exercise of the protected right to [file a grievance or lawsuit] *followed by* an adverse act." (emphasis added)).

Moreover, Welsh admits that he verbally berated Dr. Cammack by calling him a "piece of shi*," which fails to show that Dr. Cammack would have terminated Welsh as a patient and discontinued his prescription but for Welsh's threat to initiate legal action. *See* Compl. 5. On these grounds, Welsh has likewise failed to state a viable claim. *See Smith v. Hebert*, 533 F. App'x 479, 482 (5th Cir. 2013) (per curiam) ("To show the causation necessary to succeed on a retaliation claim, a prisoner must show that the adverse act would not have occurred but for the retaliatory motive."); *Mahogany v. Rogers*, 293 F. App'x 259, 260 (5th Cir. 2008) (per curiam) (affirming dismissal of prisoner's retaliation claim where he did not allege a chronology of events from which retaliation could be inferred).

The undersigned therefore recommends the district judge dismiss Welsh's retaliation claim against Dr. Cammack.

## IV.   Recommendation

For these reasons, the undersigned **RECOMMENDS** that the United States District Judge dismiss Welsh's claims with prejudice in accordance with § 1915 and as described more fully herein.

## V.     Right to Object

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within fourteen days after being served with a copy. *See* 28 U.S.C. § 636(b)(1) (2016); FED. R. CIV. P. 72(b). To be specific, an objection must identify the specific finding, conclusion, or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's Report and Recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

Dated: June 30, 2023.

D. GORDON BRYANT, JR.
UNITED STATES MAGISTRATE JUDGE